# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **ESSEX ENERGY, L.L.C.,** | : | |
| **Plaintiff,** | : | NO. _____ |
| | : | |
| **VERSUS** | : | |
| | : | |
| **SCOTT WILLIS, ET AL** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## COMPLAINT FOR DAMAGES

**NOW INTO COURT,** through undersigned counsel, comes Plaintiff, Essex Energy, L.L.C., which files this Complaint for Damages

## THE PARTIES

### 1.

Plaintiff, Essex Energy, LLC ("**Essex**") is a limited liability company that is organized under the laws of the State of Louisiana.  For purposes of diversity jurisdiction, non-incorporated businesses such as partnerships and limited liability companies assume the citizenship of each of their partners and members, respectively. None of the members of Essex are domiciliaries or citizens of the State of Louisiana.    The members of Essex are (1) Five Oceans Shipping Ltd. (a British private limited company with its principal place of business in London, England) – to the extent such an allegation is required, none of the members/partners/shareholders of Five Oceans Shipping Ltd. are domiciled in or citizens of Louisiana; (2) Kyoto Investments LLC (a Utah Limited Liability Company) - the members of Kyoto Investments LLC are named George Sorenson and Keiko Sorenson and are domiciled in and citizens of Connecticut, not Louisiana; (3) and RDB Holdings LLC (a Vermont Limited Liability Company) – the sole member of RDB Holdings, LLC is named Robert Botjer who is domiciled in and a citizen of Vermont, not Louisiana.

782059.2

Both Sterling Scott Willis and David-Logan Schroeder, defendants herein, are citizens of the State of Louisiana.  Moreover, all of the partners of Fishman Haygood, L.L.P. are citizens of the State of Louisiana.  Accordingly, all defendants are completely diverse from the members of the members of Essex.

**2.**

Made Defendants herein are:

    a.    **Fishman Haygood, L.L.P. ("Fishman Haygood")**, a Louisiana Limited Liability Partnership, which is domiciled in Louisiana;  upon information and belief, the partners in Fishman Haygood, L.L.P. are completely diverse from the members of the members of Essex;

    b.    **Sterling Scott Willis ("Willis")**, a domiciliary and citizen of Louisiana and the Parish of Orleans; and,

    c.    **David-Logan Schroeder ("Schroeder")**, a domiciliary and citizen of Louisiana and the Parish of Caddo.

(collectively, "Defendants")

**SUBJECT MATTER JURISDICTION**

**3.**

This Court has diversity subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332, as complete diversity exists between plaintiff and defendants, and the amount in controversy exceeds $75,000.00.

782059.2

**JURISDICTIONAL AMOUNT IS SATISFIED**

**4.**

Pursuant to 28 U.S.C. § 1332, for diversity jurisdiction to exist, the amount in controversy must exceed $75,000.00.  As is further articulated below, Essex seeks damages from Defendants in an amount exceeding one million ($1,000,000) dollars.  As such, the amount in controversy exceeds the jurisdictional amount of $75,000.00.  Because complete diversity exists and the jurisdictional amount has been satisfied, this Court has diversity subject matter jurisdiction of this action.

**VENUE**

**5.**

The Middle District of Louisiana is the proper venue for this litigation.  Pursuant to 28 U.S.C. § 1391(b)(2), a civil action may be brought "in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated."  Here, the events and omissions giving rise to Essex's claims against Defendants occurred in East Baton Rouge Parish and the property that is the subject of this action is situated in East Baton Rouge Parish. Accordingly, the Middle District is the proper venue.

**BACKGROUND**

**6.**

This is a suit for damages for legal malpractice and for the failure to supervise an attorney who committed legal malpractice.

- 3 -

782059.2

**7.**

In 1937, Harry B. Nelson, et al granted an Oil, Gas & Mineral Lease ("**the Nelson Lease**") on a tract of land in East Baton Rouge Parish ("**the Nelson Tract**") to Louisiana Crusader Oil, Inc.

**8.**

Throughout the life of the Nelson Lease, and continuing to this day, a number of oil and gas wells were drilled on the Nelson Tract, including the Nelson No. 5 well, the Nelson No. 8 well, the Nelson No. 13 well, and the Nelson No. 14 well (these four wells are referred to herein as "**the Nelson Wells**").

**9.**

In or around 2004, after mesne assignments and conveyances, Milco 2003 – University. LLC ("Milco") obtained a 100% working interest in and to the Nelson Lease.

**10.**

Beginning in 2007, a group of real estate investors, one of whom is named Terry White, planned a commercial and residential development on parts of the Nelson Tract.

**11.**

In or around February 2007, the group of investors purchased the Nelson Tract from the Nelson family, the surface and mineral owners at the time.  At that time and in the relevant deed, the Nelson family, as mineral servitude owners, granted a waiver of surface rights on the Nelson Tract to the surface owners, with certain areas carved out where surface operations for mineral development were allowed.

- 4 -

**12.**

Also in February 2007, Milco granted a Partial Release of Surface Rights Under Mineral Lease to the surface rights owner wherein Milco released its right to conduct surface operations on most of the Nelson Tract under the Nelson Lease, but expressly carved out certain areas on the Nelson Tract where surface operations were allowed.

**13.**

In or around in February 2011, BCM-Louisiana LLC ("BCM-LA") was formed with two members, BCM Energy Partners, Inc. (49%) and Worthmore Capital L.L.C. ("**Worthmore**") (51%) to hold oil and gas assets and liabilities related to a prospect in the University Field in East Baton Rouge Parish.  The prospect essentially consisted of fourteen (14) leases with the core leases being: (1) the  Nelson Lease, comprising the Nelson Tract, and (2) the Duplantier Lease.

**14.**

In addition to its 51% membership interest, Worthmore owned a note payable worth approximately $1.525 million, which was secured by a first lien on all the University Field prospect oil and gas assets of BCM-LA and guaranteed by BCM-LA's CEO, David Beach, and one of its directors, Jackie Counce.

**15.**

After mesne assignments and conveyances, BCM-LA obtained a 100% working interest in the Nelson Lease.

782059.2

**16.**

In July 2012, BCM-LA raised capital by selling preferred membership interests to three new investors, George Sorenson, Robert Botjer Revocable Trust, and Five Oceans Shipping Ltd. (collectively "**the preferred investors**") so BCM-LA could develop the University Field prospect and other potential areas.

**17.**

The preferred members made additional investments over the next year, but grew uneasy with management over the poor performance and lack of timely and accurate financial accounting and refused to make additional investments.

**18.**

Around the end of 2013, the preferred investors developed an alternative business plan for the University Field assets and began negotiating with David Beach, the CEO of BCM-LA and Terry White, the principal of Worthmore Capital, as the secured lender.

**19.**

In mid-January 2014, the preferred investors retained Fishman Haygood, specifically Willis and Schroeder, to represent and assist them in executing the proposed transaction that was taking shape. Fishman Haygood obtained a conflict waiver from Terry White because the firm previously did for legal work for Mr. White and/or one of his companies.

782059.2

**20.**

Willis, a Fishman Haygood partner, and Schroeder, an associate with Fishman Haygood, worked on the transaction and advised the preferred investors regarding what was needed to complete the transfer of the assets.

**21.**

Christopher Ward ("**Ward**"), a consultant for the preferred investors, was the primary contact with Willis and Schroeder on the various transactions.

**22.**

After consultation with Willis and Schroeder, Ward and the preferred investors decided that, through various transactions, they would extract the University Field assets from BCM-LA and transfer those assets to a new company, Essex Energy, LLC.  The preferred investors, after consultation with Defendants, believed that starting operations with a "clean company" was preferable to taking over BCM-LA and redeeming their interests.

**23.**

In preparation for the transactions, Ward discussed title, risk, and indemnity issues with Defendants and identified the wells they wished to develop, which included the Nelson Wells, among others.   Ward also identified two wells that wouldn't be transferred over as those represented only plugging and abandoning ("**P&A**") liabilities.

**24.**

Schroeder reviewed title documents, title opinions, title reports, and other diligence and documents.

- 7 -

**25.**

Schroeder reviewed the 1937 Nelson Lease, various assignments, and other documents

**26.**

Also, as part of Fishman Haygood's review of the documents and title work in February 2014, at Schroeder's request, Ward forwarded a title opinion which referenced a Partial Release of Surface Rights on the Nelson Tract.

**27.**

On or about February 5, 2014, Ward spoke to Schroeder regarding an upcoming meeting Schroeder was to have with the attorneys acting on BCM's behalf, Shaun Rafferty and Marc Livaudais, on February 6, 2014.  Ward specifically asked Schroeder to find out exactly the assets that were to be transferred.  Ward made it clear that he wanted to make sure that the preferred investors were getting what they were paying for and to confirm that the business plan for the prospect was consistent with the assets that were going to be transferred.

**28.**

On February 6, 2014, the Fishman Haygood lawyers met with Mr. Rafferty and Mr. Livaudais.

**29.**

Shortly after the February 6 meeting, Schroeder gave Ward an update.  Schroeder reported that most of the wells on the Nelson Tract were plugged and abandoned and most of the surface rights on the Nelson Tract were "given up," except for a "corner of the Nelson Tract, which contained wells and surface equipment" where Essex, the company the assets were to be

- 8 -

placed in, could develop the prospect.  Ward took this to mean that the wells in "the corner" which weren't plugged and abandoned could be developed.  Schroeder apparently believed this as well.

**30.**

Shortly after the meeting, Mr. Rafferty sent Schroeder a "Dropbox" of what Schroeder referred to as "additional diligence."   Schroeder reviewed the Dropbox documents to make sure it contained all the important documents he wanted to review for the transaction.  Both Schroeder and Willis invoiced Essex for reviewing the Dropbox documents. This Dropbox contained a Partial Release of Surface Rights under the folder "Nelson transaction documents."

**31.**

On or about May 22, 2014, BCM-LA conveyed the University Field assets, including the Nelson Lease affecting the Nelson Tract, and expressly noting the Nelson Wells, among others, along with certain liabilities to the three preferred members in exchange (via redemption) for their preferred membership interests in BCM-LA.

**32.**

BCM-LA also redeemed the membership interest of Worthmore Capital leaving BCM Energy Partners, Inc. as the sole member of BCM-LA.  After closing the transaction, BCM-LA continued to hold certain operating oil and gas assets and other liabilities.

**33.**

Next, in a multi-party agreement, Five Oceans Shipping Ltd. agreed to purchase the secured note from Worthmore Capital, and Worthmore Capital agreed to allow BCM-LA to

- 9 -

782059.2

redeem their membership interest and sever their interest in the University Field oil and gas assets, including the Nelson Tract and Nelson Wells.   Five Oceans agreed to release David Beach, CEO of BCM-LA, and Jackie Counce, the former director of BCM-LA, from their personal guarantees of the secured note.

**34.**

Finally, as part of the May 22, 2014 transactions, the three "preferred members" conveyed their undivided interests in the University Field assets and liabilities, including the leasehold rights to the Nelson Tract and the right to operate, access, and produce the Nelson Wells, to the newly formed Essex Energy LLC with each person / entity receiving a proportional share of Essex Energy LLC membership interest based on their share of cumulative capital invested in BCM-LA.

**35.**

Essex then entered into a Joint Operating Agreement with University Field Management LLC, the principal of which is Ruben Shealy, to be contract operator of record and provided the required operator's bond to the Louisiana Commission of Conservation.

**36.**

Essex, through University Field Management, LLC, then began operating the various wells in the University Field prospect, including the Nelson wells.

**37.**

In or around late October 2014, Essex was informed that a Partial Release of Surface Rights Under Mineral Lease was entered into by Milco whereby Milco released the rights it had

- 10 -

782059.2

to conduct surface operations on most of the Nelson Lease and the Nelson Tract, and on all of the Nelson Wells.

**38.**

While the Partial Release of Surface Rights did effectively allow the right to conduct surface operations on certain areas of the Nelson Lease, the release effectively prevents any operator or lessee from accessing or operating the Nelson Wells.

**39.**

At no time did Defendants inform Essex or Ward of BCM-LA's lack of the right to conduct surface operations or lack of the right to access the Nelson Wells.

**40.**

Upon information and belief, all lessees of the Nelson Lease who operated the Nelson Lease after the Partial Release of Surface Rights entered into in February 2007 continued to operate the Nelson Wells without interference from the surface owners, despite the Partial Release of Surface Rights.

**41.**

In November, 2014, shortly after discovering the Partial Release, Ward and Mr. Eduardo Bundyra, on behalf of Essex, informed Fishman Haygood and Willis about Essex's inability to conduct surface operations on the Nelson Wells.  They also asked Willis how he and Schroeder missed this issue.  Ward and Bundyra expressed concern that Essex effectively purchased wells, the Nelson wells, that it had no right to conduct operations on.

782059.2

**42.**

After being notified, Willis told Ward and Bundyra that he, Willis, would look into the issues.

**43.**

Shortly thereafter, Willis informed Essex that he and Fishman Haygood could no longer represent Essex in the matter because of a conflict he had with Fishman Haygood's previous client, Terry White. He noted the possibility of Fishman Haygood having to take legal action against Terry White or one of his companies.

**44.**

At all times, Essex believed that Fishman Haygood and its lawyers were representing it by scrutinizing the various contracts and all other relevant documents.  Essex requested and believed that Defendants would disclose the full import of the various relevant documents and diligence, as well as possible pitfalls which could affect Essex.  Indeed, Ward repeatedly told Schroeder, "We need to know what we are getting" because the Essex business plan was based on the belief that certain assets, including the rights to operate and access the Nelson wells, were being transferred.  Ward also expressed to Schroeder that he did not want Essex to be transferred P&A liability without development potential.

**45.**

Despite having reviewed the Partial Release of Surface Rights, despite invoicing Essex for same, and despite having reviewed a title opinion which made reference to the Partial Release of Surface Rights, as lawyer representing an out of state transferee, Fishman Haygood, Willis,

- 12 -

782059.2

and Schroeder failed to notify Essex of the potential pitfalls in the transactions, especially the lack of surface rights to operate the Nelson Wells which were being acquired, in breach of the standard of care.

**46.**

At no point before the transaction closed on May 22, 2014, did Willis or Schroeder inform or advise Essex or any of its principals regarding the risks of entering into the transactions in the face of the Partial Release of Surface Rights., i.e. the lack of surface rights.

**47.**

Had Willis and/or Schroeder informed Essex on May 21, 2014 that BCM-LA did not have the right to access and conduct operations on the Nelson wells (absent some grant of the surface rights by the surface owners), Essex would have never entered into the subject transactions.  Moreover, Essex would not have become the lessee of wells of which it could not operate or fulfill its development plans (because of the lack of surface rights) and for which they may have to plug and abandon immediately after the transfer.

**48.**

Attorneys representing transferees in oil and gas transactions have a duty to scrutinize all relevant contracts and documents, especially those that are provided to the attorneys.  Further, the duty extends to disclosing the full import of the various relevant documents and due diligence, as well as possible pitfalls which could affect the transferee.

782059.2

**49.**

Defendants breached the standard of care for lawyers representing clients purchasing oil and gas assets. Defendants failed to raise the Partial Release of Surface Rights as an issue or a problem before Essex closed the transaction on May 22, 2014, despite Essex's clear expressed intent that it intended to access, operate, and produce the Nelson Wells and that it did not want to acquire P&A liability.

**50.**

In addition Fishman Haygood and/or Willis failed to properly supervise Schroeder to ensure that he acted within the applicable standard of care for representing buyers in an oil and gas transaction.

**51.**

As a result of Defendants' legal malpractice and failure to supervise, Essex has effectively purchased P&A liability for all of the Nelson wells and forfeited future development plans on the Nelson Wells. In fact, Essex has already been forced to plug and abandon the Nelson No. 13 well after demand by the current surface owner.

**52.**

Essex has incurred costs in excess of $80,000 for plugging and abandoning the Nelson 13 well, a well which Essex anticipated developing at the time of the May 22, 2014 transaction.

**53.**

In addition, while the Nelson No. 14 is currently producing and was producing at the time of the transfer to Essex, given the Partial Release of Surface Rights, Essex has effectively

- 14 -

782059.2

purchased P&A liability for a producing well.  Essex also had future developments plans for other productive sands for the Nelson 14 well, plans which cannot be fulfilled given the lack of surface rights.

## 54.

In addition to the Nelson 13 and Nelson 14 wells, Essex had future development plans for the Nelson 5 and the Nelson 8 Wells, which cannot be fulfilled.

## 55.

Essex continues to try to mitigate the effects of Defendants' legal malpractice, however, as a result of Defendants breach of the standard of care and failure to supervise,  the cost to plug and abandon the Nelson Wells combined with the loss of planned production revenue of the Nelson Wells has caused damages to Essex in excess of one million ($1,000,000.00) dollars. Accordingly, Defendants are liable in solido for Essex's damages.

## PRAYER

**WHEREFORE**, Plaintiff, Essex Energy, LLC, prays that its Complaint against Defendants, Fishman Haygood, LLP, Sterling Scott Willis, and David-Logan Schroeder, be deemed sufficient, and that after all due proceedings be had, there be judgment, in solido, in favor of plaintiff and against defendants, plus interest thereon, plus all costs incurred by plaintiff in this action.

782059.2

Respectfully submitted,

TAYLOR, PORTER, BROOKS & PHILLIPS L.L.P.

By: /s/Edward D. Hughes _____
    Harry J. Philips, Jr., Bar # 2047
    Edward D. Hughes, Bar # 28617
    Jonathan A. Moore, Bar # 34686
    451 Florida Street, 8th Floor (70801)
    P.O. Box 2471
    Baton Rouge, LA 70821
    Phone: (225) 387-3221
    Fax: (225) 346-8049
    ***Attorneys for Plaintiff, Essex Energy, L.L.C.***

**Service Information:**
Sterling Scott Willis
1938 State Street
New Orleans, LA   70118-6252
(Orleans Parish)

David-Logan Schroeder
10987 Cattail Pt.
Shreveport, LA   71106-9367
(Caddo Parish)

Fishman Haygood, LLP
8555 United Plaza Boulevard, Suite 110
Baton Rouge, LA   70809-2260
(East Baton Rouge Parish)

- 16 -

782059.2